1  J. KEVIN LILLY, Bar No. 119981
   klilly@littler.com
2  SHANNON R. BOYCE, Bar No. 229041
   sboyce@littler.com
3  RACHEL T. SEGAL, Bar No. 274644
   rsegal@littler.com
4  LITTLER MENDELSON, P.C.
   2049 Century Park East
5  5th Floor
   Los Angeles, CA 90067.3107
6  Telephone: 310.553.0308
   Facsimile: 310.553.5583
7
   Attorneys for Defendants
8  BROOKDALE SENIOR LIVING
   COMMUNITIES, INC., BROOKDALE LIVING
9  COMMUNITIES, INC., BKD TWENTY-ONE
   MANAGEMENT COMPANY, INC.
10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13  GENEFLOR SACRO, on behalf of         Case No. 2:17-cv-02632-VAP-SS
    herself and all other similarly-situated
14  individuals,                         **ORDER GRANTING JOINT
                                         STIPULATION CONFIRMING
15              Plaintiff,               ARBITRATION AWARD,
                                         ENTERING JUDGMENT IN
16  v.                                   ACCORDANCE THEREWITH,
                                         AND DISMISSING PAGA CLAIM**
17  BROOKDALE SENIOR LIVING
    COMMUNITIES, INC., a Delaware
18  corporation; BROOKDALE LIVING
    COMMUNITIES, INC., a Delaware
19  corporation; BKD TWENTY-ONE
    MANAGEMENT COMPANY, INC., a
20  Delaware corporation; and DOES 1
    through 10, inclusive,
21
                Defendants.
22

23

24

25

26

27

28

1    Upon consideration of the Parties' Stipulation to Confirm Arbitration Award And

2  Enter Judgment For Defendant,

3    **IT IS HEREBY ORDERED THAT:**

4    1.    The Arbitrator's Award in the matter of *Geneflor Sacro v. Brookdale*

5  *Senior Living, Inc., et al.*, ADR Case No. 19-01 15-MRR, attached hereto as **Exhibit**

6  **A**, shall be confirmed by the Court pursuant to the Federal Arbitration Act, 9 U.S.C. §

7  9 and California Code of Civil Procedure section 1285, *et seq.*

8    2.    No grounds exist under 9 U.S.C. §§ 10-11 or California Code of Civil

9  Procedure section 1285, *et seq.* to vacate, modify or otherwise correct the Arbitrator's

10  Award in the above-listed matter, and Defendants have satisfied any and all necessary

11  preconditions to confirming and entering judgment on the Arbitration Award.

12    3.    Judgment is entered in favor of Defendants and against Plaintiff in

13  accordance with the Arbitration Award.

14    4.    Plaintiff's PAGA claim shall be dismissed, with prejudice as to Plaintiff,

15  for lack of standing

16    5.    Plaintiff and Defendants shall each bear their own attorneys' fees and costs

17  incurred in connection with the prosecution and defense, respectively, of Plaintiff's

18  claims.

19

20    **IT IS SO ORDERED AND ADJUDGED.**

21

22   Dated: November 9, 2020

23    HON. VIRGINIA A. PHILLIPS

24    UNITED STATES DISTRICT COURT
     JUDGE

25  4816-7093-0882.2

26

27

28

LITTLER MENDELSON, P.C.
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

# Exhibit A

A1    Hon. Michelle R. Rosenblatt (Ret.)
2     ADR SERVICES, INC.
      1900 Avenue of the Stars
3     Suite 250
      Los Angeles, CA 90067
4     PH (310) 201-0010

5

6                    IN THE MATTER OF THE ARBITRATION BETWEEN
7

8

9     GENEFLOR SACRO                          ADRS No.: 19-0115-MRR

10              Claimant,

11    vs.                                     **AWARD**

12    BROOKDALE SENIOR LIVING
13    COMMUNITITES, INC.; BROOKDALE
      LIVING COMMUNITIES, INC.; BKD
14    TWENTY-ONE MANAGEMENT COMPANY,
      INC.; AND DOES 1 THROUGH 10,
15    INCLUSIVE

16              Respondents

17
         The Arbitration hearing in this matter was heard on January 13, 14, 15, 16 and 17, 2020.
18
19    Attorneys C. Joe Sayas, Esq., LAW OFFICES OF C. JOE SAYAS and Wilmer J. Harris, Esq.

20    SCHONBRUN SEPLOW HARRIS & HOFFMAN, appeared for Claimant, Geneflor Sacro.

21    Attorneys Shannon R. Boyce, Esq., and Rachel T. Segal, LITTLER MENDELSON, appeared for

22    Respondents, Brookdale Senior Living Communities, Inc.; Brookdale Living Communities, Inc.,

23    and BKD Twenty-One Management Company, Inc. (hereinafter Brookdale.)  By stipulation of

24    the parties, the parties rested subject to the introduction of deposition testimony from two

25    witnesses: Sonja Brunston-Fergus and Christopher Cook. Each party submitted deposition

26    excerpts. At the request of the Claimant, the parties also reappeared by video conference on

27

28    FINAL AWARD                                                                            1

March 11, 2020 for an oral closing argument. The parties submitted post-Arbitration briefs and the matter was deemed submitted March 24, 2020, when the last brief was filed. The Arbitrator thanks each counsel for their thorough and well-presented written and oral presentations of the evidence and arguments in this matter.

A. The Nature of the Dispute and the Claims

Claimant Geneflor Sacro, a supervising registered nurse, brings this Arbitration against Brookdale, an owner and operator of skilled nursing facilities, for violations she alleges occurred while she worked at Brookdale Camarillo. Ms. Sacro claims failure to pay overtime for off the clock work, failure to pay for missed meal breaks, failure to pay for missed rest breaks, wage statement violations and waiting time penalties. Claimant urges the Arbitrator to find, among other things, that Brookdale's meal and rest break policies were inadequate, that Brookdale Camarillo fostered an environment in which there was too much work required and nurses were required to work off the clock to meet the demand, and that the electronic medical record system, Point Click Care, was available to Brookdale to show the off the clock hours Ms. Sacro worked.

Respondent denies the allegations and urges the Arbitrator to find, among other things, that Brookdale Camarillo maintained an adequate time-keeping system, that Brookdale's meal and rest break policies were lawful, that Ms. Sacro was not required to work off the clock, that if she did so, she intentionally hid that she worked off the clock from Brookdale, that Brookdale was entitled to rely on the Kronos time-keeping system and that the management was entitled to rely on Ms. Sacro's reporting and honesty. Additionally, Respondent urges the Arbitrator to find that Point Click Care is not a time-keeping system, it is an electronic patient records system, is not valuable as an indicator of time worked by an employee, and that Brookdale was not

FINAL AWARD                                                                                    2

required, during Ms. Sacro's employment, to investigate whether Ms. Sacro was reporting all of her time by looking at Point Click Care.

B. Factual Findings

(1) Credibility of the Witnesses:

Geneflor Sacro: Ms. Sacro has been a nurse for twenty-three years, and a licensed registered nurse in California for fourteen years. Previously, she worked as a nurse in the Philippines and in Illinois. Ms. Sacro worked for Brookdale for fifteen months: from March 2015 to June 2016. She began as a charge nurse and within four months became a nurse supervisor. She was classified as an hourly, non-exempt employee. She is familiar with the written job description for an RN at Brookdale (Exhibit 5). As a nurse supervisor, she had more responsibilities than as a charge nurse, and worked the 11 a.m. to 7:30 p.m. shift. She detailed her responsibilities and duties. Ms. Sacro reported to Mr. Ahanmisi, the director of nursing. She was trained on the Kronos time-keeping system, and the clock in and out responsibilities for meal breaks. She was trained to get overtime authorized by her supervisor unless he was not available, in which case she could ask the Director of Staff and Development (DSD) to authorize overtime. From the very first day of her work she knew the clock in and clock out requirement. No one from management ever told her to work off the clock, that she could not take a meal break, that she could not take a rest break.

Ms. Sacro knew that by signing the Employee Handbook that she was agreeing to comply with Brookdale's policies. She understood the written policy that falsifying time records could lead to discipline up to and including termination. Ms. Sacro's understanding was if she did not clock in or out at meal break time, she needed to fill out a Kronos Adjustment Form. She understood that falsifying a Kronos Adjustment Form was a falsification of time records. The Brookdale Code of Conduct required her to work with integrity.

FINAL AWARD

A 1    Mr. Ahanmisi would always authorize some overtime of up to two hours. However, she would

2    continue to work after she clocked out even when she worked authorized overtime because the

3    work was not yet completed. Ms. Sacro testified in essence that there was too much work to get it

4    all done during the shift. Ms. Sacro testified that it was very important that she herself document

5    admissions, discharges and changes of conditions that because of the timing could not be delegated.

6    Ms. Sacro testified that she told Mr. Ahanmisi approximately three months after she started,

7    approximately June 2015, that she was working beyond the authorized overtime. Ms. Sacro

8    testified she would tell Mr. Ahanmisi, such as by saying, "I had three admissions last night so I

9    had to stay over to complete them." Mr. Ahanmisi would deny her overtime and tell her he would

10    get in trouble with his boss if he authorized too much overtime, and that he was afraid of being

11    fired. She recalls a time when she was working off the clock and Mr. Ahanmisi asked her if she

12    was working overtime and she said no, she clocked out already. He said "you know you can't

13    work off the clock," and she said "I know but I still have a lot to finish." In later testimony, Ms.

14    Sacro testified that in her second or third week of work for Brookdale, at the end of March 2015,

15    Mr. Ahanmisi warned her about working off the clock. She was still on the 7am to 3 pm shift and

16    she was working at 4:30 or 5 p.m. Mr. Ahanmisi made a comment about overtime and she told

17    him she had clocked out already. This happened several times, and each time Mr. Ahanmisi would

18    say "Gene, go home." Ms. Sacro's testimony that she told Mr. Ahanmisi in February and March

19    2015 that she was working off the clock is not credible. Ms. Sacro testified that in April or May of

20    2015 she told Mr. Ahanmisi that she saw some nurses working off the clock. Ms. Sacro also

21    testified that in February 2016, a group of nurses complained to her about too much work and

22

23

24

25

26    working off the clock, so she went to Mr. Ahanmisi. He told her that she was their supervisor and

27

28    FINAL AWARD                                                                                          4

A1   that her job is to support her staff.  He told her that work has to be delegated to the next shift, let
2   the next shift do their part.

3       Ms. Sacro testified that the standard of care is that if a nurse assesses a patient, that nurse is to
4
5   document and sign in a timely manner. Ms. Sacro testified that if she does not do so and something
6   happens, she could lose her license, a patient could die. However, neither of these concerns led her
7   to contact the executive director or to call the Integrity Hotline. This testimony is not credible. The
8   nurses were reminded by Mr. Ahanmisi in meetings not to work off the clock, to try to leave at the
9   end of their shifts, to delegate, endorse work.
10
11      Ms. Sacro testified that she would log out of PCC to go from one patient's chart to another if
12  she was using the computer at the nurse's station. With the laptop computers on the carts, which
13  is what she used during off the clock charting, whether she logged out of PCC or just minimized
14  the screen would depend on what she was doing. Her practice was not to rely on the automatic log-
15  off.  It is possible that she forgot to log out.
16
17      Ms. Sacro had a meeting with Mr. Ahanmisi on May 13, 2016 when he told her not to seek
18  overtime without approval and would be given thirty minutes to two hours. At that meeting of May
19  13, 2016, Ms. Sacro was placed on an action plan for working overtime without approval. (Exhibit
20  9). Mr. Ahanmisi said "delegate the work." He said she needed to eat. He never said he would not
21  approve overtime. He wanted her to ask in advance. Ms. Sacro said she cried, expressed frustration
22  at the amount of work, how she needs to be available for her daughter who is struggling in school
23
24  and for her young son.

25      Ms. Sacro testified that she told Mr. Ahanmisi and Ms. Mohr that if she did not work through
26  her meal and rest breaks she would never be home on time. Mr. Ahanmisi stressed that she needed
27  to delegate. He said the nurses needed to manage their time.  Ms. Sacro testified that Ms. Mohr
28  FINAL AWARD                                                                                    5

acknowledged the workload. Ms. Sacro testified that she told them in this meeting that she usually left work between 9 pm and 3 am. This testimony was not credible.

The demands on her time were high. She clocked out for her meals even though she was working just so she could create a record of compliance. No one ever instructed her to do this. Ms. Sacro testified to the fact that sometimes she wrote Kronos Adjustment Forms in which she said she took a thirty minute break before the fifth hour and tenth hour as reflected in the Kronos Adjustment Form, but in fact, she did not take the breaks. There was no time for breaks. She lied on the form. She didn't take rest breaks either, but she knew she was entitled and no one from Brookdale told her not to take her breaks. Brookdale never paid her a rest break penalty. Ms. Sacro continued to ask for some overtime, but always asked for under two hours. Then she would work off the clock. She has no records of days she could not take a full thirty minute meal break.

Ms. Sacro testified that she believed it was important for her to see all the new patients when they would come in, to lessen their anxiety and because the charge nurses are busy. She said it takes about four hours to orient a patient. She said she would not do Medicare charting unless an RN needed help. She testified it takes time to change an IV, and that there are certain telephone calls that she could not delegate. This testimony was contradicted by the credible testimony of Kera Jensen.

Ms. Sacro knew the written policy said to report any issues to the Integrity Hotline or the Compliance Officer. She did not report to anyone that Mr. Ahanmisi allowed her to work off the clock. She knew she could file a grievance. But she did not.

Ms. Sacro recounted the May 19, 2016 incident in which two CNAs asked her for help and were disrespectful to her. She called Mr. Ahanmisi afterward. She attended a May 20, 2016 meeting about the incident with Ms. Mary Mohr and Mr. Vincent Gonzaga. They asked her if it

FINAL AWARD

was true that she was working off the clock.  Ms. Sacro testified that she was surprised because

Ms. Mohr knew from a February 2016 meeting she had with Ms. Mohr and Mr. Ahanmisi that she

had  worked off the clock. At that time, she promised them she would not work off the clock. She

did not tell them she was not taking the breaks she wrote on her Kronos Adjustment Forms. Ms.

Sacro admitted working off the clock and Ms. Mohr reiterated the policy.  Mr. Gonzaga told her

she needed to try her best to delegate work to others and finish on time. Neither told her what tasks

to delegate. She was told to reconstruct her off the clock hours.

Ms. Sacro testified that did not tell Mr. Gonzaga prior to the May 20 meeting that Mr. Ahanmisi

knew she was working off the clock because she was trying to protect him. However, at the May

20 meeting, after Mr. Ahanmisi was off the call, she told Mr. Gonzaga that Mr. Ahanmisi knew

she was working off the clock. She did not tell Ms. Mohr and Mr. Gonzaga how long she had been

working off the clock because she thought she would be in big trouble. She was confused at the

end of the meeting because she did not keep track of her hours and there is no way to reconstruct

them.

On her last day, June 1, 2016, Kera Cunningham in Human Resources asked her to gather her

overtime hours. PCC was mentioned. She asked Ms. Cunningham if she had to be clocked in to

try to reconstruct her hours and Ms. Cunningham said yes.  Ms. Sacro resigned on June 2, 2016.

The resignation letter does not mention working off the clock, or missed meal or rest breaks.

Ms. Sacro testified she felt like she was being blamed for working the long hours to help Brookdale

and to help the patients. She testified that she worked off the clock almost daily – one to seven

hours.  Getting documentation done was a patient safety concern.  She did not report this to the

Integrity Hotline so that Mr. Ahanmisi would not get fired.  This testimony, as well as much of

Ms. Sacro's testimony, was not credible.

FINAL AWARD                                                                                                      7

(2)Mr. Okahwere Ahanmisi ("Nisi"): Okahwere Ahanmisi, currently Director of Clinical Services at Brookdale, was the Director of Nursing at Brookdale Camarillo when Ms. Sacro worked there as a registered nurse and then nurse supervisor.

Brookdale is a thirty-five to forty-five bed skilled nursing facility for short term/two-week patients. Generally the patients are stable. Brookdale Camarillo is not an intensive care facility. During the time in question, 2015 to 2016, the state staffing requirement for patient care was 3.2 patients per staff member. Brookdale exceeded that state requirement.

There are certain documented essential functions of the RNs and the LVNs, including what can be delegated and what cannot. These tasks are set forth in the job descriptions (Exhibit 5). There are generally three people on duty per shift, a combination of RNs and LVNs, and they are expected to work as a team. He expects that his nurse supervisor will delegate to the team those tasks that can be delegated so that all work can be completed. He has never formed the opinion that more staffing was needed. His overtime decisions have never been questioned. He has never been disciplined for allowing too much overtime.

He scheduled meal breaks scattered before the fifth hour of work. He did not monitor who did or did not take their breaks. He had no concerns that staff could not handle the work and take breaks. He never told Ms. Sacro not to take her breaks and he was not aware that she was not taking her meal or rest breaks. He never told her she could not take a break.

Ms. Sacro's performance review for 2015 was overall outstanding.

The priority for the RNs is patient care, and there has to be flexibility given to their break times up to the fifth hour. At deposition, Mr. Ahanmisi did not clarify that the flexibility as to break times should always be up to the fifth hour. An RN who is on break is not to be called back, and patient charting can be endorsed to the RN in the next shift at the end of the shift.

FINAL AWARD                                                                                                8

Mr. Ahanmisi's work schedule and Ms. Sacro's shifts did not completely overlap and he was never present when Ms. Sacro clocked out.  He worked a 9 a.m. to 5:30 p.m. shift.  Sometimes he stayed late, and sometimes he would make an impromptu appearance during the night shift.  Most of the time, Ms. Sacro worked an 11 a.m. to 7:30 p.m. shift that overlapped the other shifts.  This is called a mid-shift and this shift provided greater flexibility regarding breaks, assisting the nurses with admissions, and answering their questions.  In fact, the mid-shift was instituted at the suggestion of Ms. Sacro, to help with the admissions that generally came in at 11 a.m.  Mr. Ahanmisi did not know that after Ms. Sacro clocked out at the end of her shift, or at the end of her shift plus approved overtime, and that she would came back into the community and work off the clock.

Whenever Ms. Sacro asked for overtime approval, Mr. Ahanmisi granted it.  Sometimes he approved less time than she asked for but told her to come to him if she needed more.  She asked for overtime daily.  He always granted her overtime requests, but he never authorized more than two hours.  He never told Ms. Sacro that he would be fired if he approved her overtime.

In May 2016, Mr. Ahanmisi became aware in a meeting that Ms. Sacro was working overtime without getting prior approval.  He provided her with an Action Plan on May 13, 2016 in which she was told that she was providing a high number of Kronos Adjustment Forms, that they were not for overtime approval purposes, and that instead, Ms. Sacro was to have her overtime requests approved in advance. [Exhibit 9-1)] This occurred before May 19, 2016, the date that the CNAs complained about Ms. Sacro. Kronos Adjustment Forms were supposed to be used as the exception, such as when a staff member missed a punch in or a punch out.  He did not discourage nurses from filling them out for proper purposes. Mr. Ahanmisi had no reason to

FINAL AWARD                                                                                                                          9

believe Ms. Sacro was lying or falsifying Kronos Adjustment Forms. He never instructed her to

create false documents to make it look like she was taking a break when she was not.

Ms. Sacro never told Mr. Ahanmisi that she was too busy to take her break or that she was

working off the clock. He did talk to her about endorsing work to the next shift. One time when

he made a late visit and saw Ms. Sacro working, he told her to clock out and go home. She had

not asked in advance for overtime. She grabbed her bag and headed for the time clock. He knew

her regular shift was over, but not that she was working off the clock. He trusted her.

On May 20, 2016, Mr. Ahanmisi first was informed that Ms. Sacro was working of the clock

when two CNAs complained that Ms. Sacro was at work, sitting in front of a computer, and

refused to help them when they asked for her help. He was very disappointed because Ms. Sacro

was one of the people he counted on and trusted. If he had suspected she was working off the

clock, he would have brought it to the attention of HR and the Executive Director, which is what

he did when this complaint was made. If Ms. Sacro is in the building, she should be on the clock

and she should render the requested assistance and provide patient safety. The fact that Ms.

Sacro clocked out and continued to work violated company policy, the fact that she did not lend

aid to nurses and provide patient care violated company policy. After meeting with the two

CNAs, Mary Mohr spoke to Ms. Sacro and told her she could not work off the clock.

Additionally, Ms. Mohr asked her how many hours she had worked off the clock so that

Brookdale could pay her. At the time, he was not aware of any other nurse working off the

clock. He only heard from Ms. Sacro, after she admitted working off the clock, that Jesse Rios

and Princess Ceja worked off the clock.

The Arbitrator found Mr. Ahanmisi's testimony to be credible.

FINAL AWARD                                                                          10

(3)Mary Mohr: Ms. Mohr is the Director of Human Resources for Brookdale Management Company at Brookdale Camarillo. She has worked at Brookdale for twelve years and has an open door policy. She is familiar with the Kronos Timekeeping System (hereinafter Kronos.) Kronos has a thirty-minute lock out feature on lunch to insure that an employee gets a full thirty minute meal break. If the break is interrupted, the employee is supposed to fill out a Kronos Adjustment Form and a new break will be provided. The preference is that this form not be used regularly because it takes time to process. At some point, Ms. Mohr formed the opinion that Ms. Sacro was submitted too many Kronos Adjustment Forms. In emails with Karen Ellis [Exhibit 23, p.2], the assistant Human Resources director, Ms. Sacro said that using a Kronos Adjustment Form was just as good as punching in and out. Ms. Ellis told Ms. Sacro she needed to manage her time so she could take her break earlier than the fifth hour, and Mr. Ahanmisi told Ms. Sacro to endorse what she was working on to others. No employee ever complained to Ms. Mohr that they were not getting their breaks or were too busy to get their breaks. She reviews the Meal and Rest Break Acknowledgement with each new hire. Ms. Sacro signed this Acknowledgement when hired and again on January 30, 2016. [See Exhibit 1 and Exhibit 54.]

Best practice is to leave the regular work area during lunch and breaks. Rest breaks are not required but are encouraged. There is a very small, rare, chance that a nurse will be asked to take a break at the community, and if the break is interrupted, the employee will be paid.

Ms. Mohr tells new hires that she has an open door policy. She tells the employees to go to their manager first, then Human Resources, then to the Executive Director, Mr. Gonzaga. She tells them that if the employee is uncomfortable doing so, he or she can call the anonymous Integrity Hotline. This number is posted in two places: in the hall and in the employee lounge. Wage Order 5 [Exhibit 56] is also posted in the Employee Lounge. Ms. Sacro never came to see her.

FINAL AWARD                                                                                                                11

A1        Ms. Mohr spoke with Mr. Ahamnisi about Ms. Sacro's time management and that she needed

2    to hand off her assignments so she could be done on time.  Following the May 12, 2016 Action

3    Plan, Ms. Sacro improved.  Rather than filling out Kronos Adjustment Forms to seek pay for

4    overtime taken, she became better about asking Mr. Ahanmisi for overtime approval prior to taking

5    the overtime.

6        Ms. Mohr was present at the meeting May 20, 2016 with Ms. Sacro about the CNAs

7    complaint and asked Ms. Sacro how long she had been working off the clock.  She did not say.

8    Ms. Mohr asked her to calculate her off the clock work.  Ms. Mohr ran Kronos for Ms. Sacro,

9    and also told her she could look at patient records so that if notes from a certain day would jog

10    her memory.   This was documented in a letter drafted by Ms. Mohr written from the Executive

11    Director, Mr. Gonzaga, Ms. Sacro.  [Exhibit 8] The letter does not say that Ms. Sacro will be

12    paid for the time it takes her to do the research necessary to calculate her hours. In the meeting,

13    Ms. Sacro said there was a lot of work and the staff was having a hard time with overtime. She

14    stated that she was having trouble completing her work. When told to endorse her work to others,

15    Ms. Sacro did not deny she could do that.  Mr. Gonzaga asked Ms. Sacro to make a list of

16    challenges with the work load that he could submit to the corporate office so that they could see

17    about getting more help, such as part time help.   Ms. Sacro never provided that list.  Ms. Mohr

18    told Ms. Sacro that they needed her help regarding what hours she worked, and she should come

19    in so they will know what they owe her.  Ms. Sacro refused. Ms. Sacro left the meeting upset and

20    crying, and told Ms. Mohr that Brookdale did not need to pay her. Ms. Sacro had never before

21    told Ms. Mohr that she worked off the clock. Ms. Mohr drafted an email from Brookdale to Ms.

22    Sacro when, as of May 23, 2016, Ms. Sacro still had not provided further information about her

23    hours worked off the clock. [Exhibit 21, p.2] Ms. Mohr also drafted a letter from Brookdale

24    [Line numbers: 1-28]

FINAL AWARD                                                                          12

dated June 1, 2016 asking her if she calculated her overtime hours. [Exhibit 8]. June 2, 2016, Ms. Sacro resigned. Again, Ms. Mohr said let's figure out what we owe you. Ms. Sacro told her not to worry about it. Ms. Mohr is not a nurse and does not have access to PCC.

In training, Ms. Mohr tells staff that they need to take a break approximately two hours after they begin their shifts, and again approximately two hours after their meal breaks. She never instructs employees that they cannot leave the premises during their rest breaks. She tells them that they can leave, eat, drink, rest, make phone calls, but she discourages them from taking their lunch breaks with the residents in the residents' lunch room because the residents typically eat together and this gives them an opportunity to mingle. Ms. Sacro signed a document that "all rest breaks and meal periods must be taken away from their regular work area." [See Exhibit 1] Most of the time there are other employees on shift to whom a nurse can hand off his/her work in order to take breaks and leave at the end of the shift. There is a balance between patient care and wage and hour policy. There is more than one nurse of the floor to insure this, but emergencies do arise, and when that happens, the employee knows to use the Kronos Adjustment Form. The Form is given to the employee's immediate supervisor, who then gives it to Ms. Mohr. She has never terminated a nurse for missed breaks, or for taking overtime. Her bonuses are not based in any way on overtime use.

No one has ever complained about Mr. Ahanmisi; no one has ever said that he is intimidating. The Exit Questionnaires from employees are only complementary. She reviewed the Exit Questionnaires of Princess Ceja, Jesse Rios and Vanessa Ivenjas. None of them complained about the workload, about not getting meal or rest breaks or that they or others had to work off the clock.

The Arbitrator finds that Mary Mohr's testimony was credible.

FINAL AWARD                                                                                    13

(4)Re Motion to Amend: At the hearing, Ms. Mohr was asked several questions regarding the name of Ms. Sacro's employer and which entity issued the final checks to Ms. Sacro, suggesting that a different entity other than BKD Twenty-One Management Company was Ms. Sacro's employer. However (1) based upon the written stipulation of the parties; (2) the credible testimony of Ms. Mohr; and (3) the post-Arbitration evidence provided by Respondent in response to Claimant's late motion to amend, the Arbitrator finds that Ms. Sacro's employer was BKD Twenty-One Management Company.

(5)Princess Ceja:  Respondent objected to the admission of testimony by Princess Ceja as Claimant removed her from the witness list and did not put her on the witness list until two business days before the Arbitration hearing.  Claimant responded that she could not find Ceja until a few days before the hearing and provided an offer of proof. The testimony was allowed. Princess Ceja testified that she and Ms. Sacro are friends.

Ms. Ceja worked at the facility from Summer 2012 to February 2017. She worked as an LVN, a treatment nurse and a charge nurse, never as a nurse supervisor. She testified that at times she saw Ms. Sacro working much later than the 11 am to 7:30 pm nurse supervisor schedule, and that Mr. Ahanmisi was in his office during some of those times. Ms. Ceja testified she worked off the clock. At times, Mr. Ahanmisi would not approve overtime and at a meeting he said no overtime. This is contradicted by Ms. Sacro as well as Mr. Ahamnisi. Ms. Ceja admitted that she never complained about the amount of work or the failure to get overtime approval, she did not call the Integrity Hotline and did not complain to Human Resources. She admitted that Mr. Ahanmisi never directed her to work off the clock.  She testified that she was afraid of Mr. Ahanmisi because he would yell at her, yet she never complained to Human Resources or the Integrity Hotline about being scared of Mr. Ahanmisi.    She never heard Mr. Ahanmisi direct Ms. Sacro to work off the

FINAL AWARD                                                                                          14

clock. She never heard Mr. Ahanmisi tell Ms. Sacro not to take a meal or rest break. Before leaving Brookdale, Brookdale paid to send Princess Ceja to a training, but Ms. Ceja was a no-call no-show. Mr. Ahanmisi and others telephoned her and came by her house but she would not answer. The Arbitrator finds that Princess Ceja was not a credible witness.

(6)Jesse Rios: Mr. Rios began working for Brookdale in 2015 or 2016, first as a CNA and then a licensed LVN at Brookdale. Ms. Sacro was his supervisor. When he would go to Mr. Ahanmisi to request overtime, Mr, Ahanmisi would yell at him. He would clock out for meal breaks and at the end of a shift, then come back and hide so he could finish his work so that Mr. Ahanmisi did not yell at him. He did not tell Ms. Ahanmisi because he thought he would get in trouble. He never told Ms. Mohr either. When he would see Ms. Sacro and other people at work beyond their regular shifts, he did not know if they had authorization to work overtime, but he assumed they were working off the clock, because they were hiding. He never heard Mr. Ahanmisi say that Ms. Sacro could not take a meal break or a rest break. He never heard Mr. Ahanmisi tell Ms. Sacro she could work off the clock. He never complained to Ms. Mohr or to Mr. Gonzaga that he had so much work he had to work off the clock. He knew off the clock work was against policy. When he resigned, he left unfinished charts behind. He testified that his letter of resignation to Mr. Ahanmisi was positive and complimentary because he wanted to leave on good terms. The Arbitrator finds that Mr. Rios was not a credible witness.

(7)Vanessa Ezennia: Ms. Ezennia was an LVN at Brookdale Camarillo between July or August 2015 and April 2016, in charge of the sub-acute unit. She was part time on the 3 pm to 11 pm shift, part of the time, was on leave between October 28 and December 13, 2015. When she returned, she was either on the 3 pm to 11pm shift or the 11 pm to 7 am shift. Ms. Sacro was her nursing supervisor, Kara Jensen was her DSD, and Mr. Ahanmisi was her director of nursing. She is

FINAL AWARD                                                                                                      15

familiar with the Kronos time-keeping system and that when one clocks out for a thirty minute break, one is locked out for the 30 minutes.   She understood she had to get overtime approved. Mr. Ahanmisi usually denied her requests for overtime, so she stopped asking.

Ms. Ezennia testified that Ms. Mohr never told her about the rest break policy, that she would be entitled to one hour pay if she missed a meal break.  However, she when presented with Exhibit 63, she acknowledged signing the meal and rest break policy.  No one ever told her she could not take a meal or rest break.

When Ms. Ezennia off the clock, she saw Ms. Sacro on the computer. Ms. Ezennia never told Mr. Ahanmisi about working off the clock.  She knew nurses were not supposed to work off the clock.  She never complained to management and never called the Integrity Hotline.  The first time Ms. Ezennia filled out an exit questionnaire but then did not resign, she stated that Mr. Ahanmisi was very knowledgeable, and that she knew of nothing illegal. The second time Ms. Ezennia left, she resigned because she got a new job.  She stated in the second exit questionnaire that she would work for Mr. Ahanmisi again because he was a good and knowledgeable supervisor.  She said she had no knowledge of any illegality. Ms. Ezennia never wrote in her exit questionnaire that she was not paid for off the clock work.   She has not worked at Brookdale Camarillo for four years.  Her testimony was not credible.

(8)Audrey Withers:  Ms. Withers is the Regional Director of Human Resources for Brookdale. She was asked about Exhibit 59 for identification and was unable to authenticate the document as something disseminated to Brookdale Camarillo employees.  She confirmed the Meal and Rest Break Policy.  Her testimony was credible.

(9)Kera Jensen:  Ms. Jensen is an LVN at Brookdale Camarillo working as a charge nurse. At the time Ms. Sacro worked at Brookdale Camarillo, Ms. Jensen was the Director of Staff

FINAL AWARD                                                                                                              16

A1  Development (DSD.) She was DSD from 2013 to September 2016. It was a salaried position. She
2   left the position in September 2016 for family reasons. Mr. Ahanmisi has always been her
3   supervisor. As DSD, part of her role was to assure that CNAs got training: in-service, infectious
4   disease control, etc. She worked approximately 7 a.m. or 7:30 a.m. to 5:30 p.m. and had
5   overlapping shifts with Ms. Sacro. When Mr. Ahanmisi was unavailable, she would text Mr.
6   Ahanmisi, and he would always approve the overtime request . When she could not reach him, Ms.
7   Jensen would approve the overtime requests. Ms. Jensen was never aware of complaints about Mr.
8   Ahanmisi not approving overtime. If Mr. Ahanmisi was not available, Ms. Jensen could sign
9   Kronos Adjustment Forms.
10
11      Nurse supervisors could help with Medicare charting and were there to support nurses because
12  supervisors did not have assigned patients. Supervisors were more at the desk. Everyone on shift
13  had call-light responsibilities and radios with earpieces to help with response time so the work
14  could get done in a timely manner.
15
16      Ms. Jensen is currently working as a charge nurse from 7 a.m. to 3:30 p.m.. The last half hour
17  is a change over with verbal reports to the next shift. She is able to take meal and rest breaks and
18  get her charting done. She has never clocked out for a meal break and then come back into the
19  community and continued working.  Nor has she seen anyone else do that. She has had to submit
20  Kronos Adjustment Forms for missed breaks and has been paid for them. Ms. Jensen testified she
21  never saw Ms. Sacro working off the clock.
22
23      No one has ever said there are restrictions on what she can do during her breaks.  She testified
24  extensively on direct and  cross-examination about the work. In part, Ms. Jensen testified that she
25  gathers information as she goes and starts her charting around 10 a.m. after her med pass and gets
26  one to one and a half hours before she has to go on her lunch break. Between 1 p.m. and 2 or 2:30
27
28  FINAL AWARD                                                                                    17

p.m. she can sit down and finish her charting.  The charting is for the primarily all Medicare patients, and Ms. Jensen testified in detail of the type of items included in the charting and how long it would typically take. She explained what items could be endorsed and what could not. Ms. Jensen also testified that admissions take approximately one and a half hours, and there is no part of admissions that specifically must be done by an RN. A single assessment has never taken her four hours. Typically they would have a one to four hour notice of admissions so that she could adjust her breaks, etc. to take them before the admissions arrived. Ms. Jensen also detailed the process of discharges.  Although discharge time can vary due to some family having more questions than others, typical would be twenty to twenty-five minutes. Most discharges are posted for the week, so they can plan. Emergencies usually would involve more than one nurse. Ms. Jensen detailed what procedures LVNs can do and which only RNs can do. She had no opinion of Ms. Sacro's time management.

In the over eight years Ms. Jensen has worked with Mr. Ahanmisi, he never told her to work off the clock or miss meal or rest breaks. Ms. Jensen uses PCC daily and regularly has seen nurses, including Ms. Sacro, log in and leave the PCC open while walking away to do something else. The fact that PCC is open does not mean that the person who logged in is charting the entire time. Ms. Jensen's testimony was credible.

(10) Vincent Gonzaga:  Mr. Gonzaga is the Executive Director III and is the licensed administrator of Brookdale Camarillo.  He typically works from 9 am to 5:30 pm, Monday through Friday, He begins his day going to skilled nursing during rounds and stops by randomly at times during the day.  Ms. Sacro never raised concerns about too much work, not being able to take breaks, or working off the clock: these would be serious matters that would warrant further discussion.  Brookdale Camarillo is an upscale nursing community. They take care of residents in

FINAL AWARD                                                                                    18

dependent living and skilled nursing. There were approximately four RNs per patient per day (3.2 mandated by the state) in skilled nursing, enough staff for nurses to cover one another. No one ever approached him about needing more staff. He prepares the budget and is aware of overtime, as it is a line item. He has never counseled or disciplined anyone regarding overtime and has never been counseled by his own supervisor regarding overtime. His annual bonus is based 70% on revenue and net operating income, 10% on audit, 10% on marketing and 10% based on staffing turnover. Overtime is part of labor, which is the biggest expense in net operating income. He has received a bonus yearly and overtime has not impacted his bonus. It is not part of the parameters.

Overtime is almost always discussed at daily standup meetings. The reason to monitor overtime is to be sure it is authorized. He encourages supervisors to check daily to be sure overtime was authorized.

Mr. Gonzaga first became aware that Ms. Sacro worked off the clock when the CNAs complained to Mr. Ahanmisi, May 20, 2016. He was shocked that a supervisor who should set standards would violate the standards. He wanted to know how many times she worked off the clock because he wanted to pay her. She did not say. She said to forget about the hours, that she would not work off the clock again. She did not say that Mr. Ahanmisi permitted her to work off the clock. Mr. Gonzaga signed a letter dated June 1, 2016 to Ms. Sacro that Ms. Mohr wrote in which it said he wanted to pay her for her off the clock hours. Mr. Gonzaga does not have access to PCC. It is for patient documentation, not for timekeeping. He does not expect Mr. Ahanmisi to cross-reference the PCC records with Kronos. Employees are expected to follow policies. They are mandated reporters, so any issue involving patient care is supposed to be reported to him. The mission statement mandates the best patient care, to treat staff with integrity and respect. He expects honesty. Mr. Gonzaga's testimony was credible.

(11) Excerpts of deposition testimony:

    Sonja Brunson-Fertgus: Ms. Brunson-Fertgus is the Manager of Clinical Informatics for Brookdale Employee Services Corporation since February 2015. Before that she worked for Emeritas from 2011 to 2015. She received training from the Point Click Care Company that built PCC when she worked for Emeritas and twice since then. She trains communities on PCC, is the point of contact for questions from Brookdale help desk regarding PCC, developed training materials regarding PCC, and troubleshoots PCC. She has the ability to generate log-in and log-out reports for all Brookdale employees in a specific location. Point Click Care is a cloud-based application for an electronic health record. She described PCC, how it works, and that Brookdale communities in California had an automatic log-out after one hour of non-use. Access is determined by job titles and communities. RNs, LVNs, CNAs, directors of clinical services, licensed practical nurses, directors of nursing, and physicians in a skilled nursing facility each have the same level of access.  Services provided to the resident are documented. This is called "charting." PCC does not have the ability to generate a report that states what the particular user did. No grounds to disbelieve this testimony were provided.

    Christopher Cook: Mr. Cook has been the Senior Director of IT Operations for Brookdale for the past two to three years and before that was Senior Director of Healthcare.  He is familiar with PCC.  Community associates, including RNs, have unique usernames and passwords to access PCC.  It is against Brookdale's rules to share these credentials with anyone else. He explained the generated PCC user report and testified that the data reflected in the report is accurate and in Pacific Standard Time.  Mr. Cook is not aware of any information that would indicate whether anyone other than Ms. Sacro ever used her PCC username and password to access PCC.  The log-out data on PCC does not generate information on whether the log-out was due to a timeout due to inactivity

or due to a user logging out. Additionally, it is not a time keeping system, so the system cannot verify whether the person who logged on with the PCC id and password, and was working on the PCC system the entire time that the person was logged in to the system or on the premises the entire time. He and his associates in IT do not have access to the PCC system and cannot generate reports. No grounds to disbelieve this testimony were provided.

(12) Brookdale Policy: During the four and a half hour on-boarding, Ms. Sacro, like other new-hires, was presented with the Employee Handbook, which was reviewed with her by Mary Mohr. The training reviews policies and procedures, responsibilities, time off, personal appearance, paid time off, chain of command, parking, payroll, worker's compensation, required training, investigations, terminations, how to punch in and how to input employee identification. Ms. Mohr explains to new hires the mission of Brookdale, which is posted in the hallway, requiring honesty in employment and documentation. Ms. Mohr explains and highlights the portion of the Employee Handbook that states that the employee is expected to clock in and out, including for meal breaks. "Recording Work Hours" [Exhibit 51, p. 25-26] states that altering, falsifying or tampering with time records is a breach of policy.

(13) Kronos Time Keeping System: This is the punch in/punch out timekeeping system that employees are required to access when they begin their shift, when they take their meal break, when they end their meal break and when they end their shift. This is the system by which employees record their work hours and the system based upon which nurses are paid. For meal breaks, when the employee punches out, he/she cannot punch back in for a half hour.

(14) Kronos Adjustment Forms: These forms are used to modify time records due to an issue with the Kronos Time Keeping System, such as missing a punch. The forms are provided by

FINAL AWARD                                                                                           21

the employee to the supervisor, and in the supervisor's absence, to Human Resources.  They are

intended for the exceptional circumstance.

(15) Actual knowledge by Brookdale of OTC work by Ms. Sacro: Ms. Mohr tells employees

that they are not to work off the clock and that such work would be a violation of policy.  Both

Ms. Sacro's supervisor, Mr. Ahanmisi, as well as the Director of Human Resources, Mary Mohr,

testified that they did not know Ms. Sacro was working off the clock until the May 20, 2016

meeting. No one at Brookdale directed Ms. Sacro to work off the clock, to disregard Brookdale's

wage and hour policies or to deliberately omit hours worked from Kronos. Ms. Mohr has had three

other examples of people working off the clock. Two years ago, Mary Mohr found out that two

employees worked off the clock.  They were paid for the time and given a warning. Another part-

time RN who only works a couple of hours per pay period did training at home off the clock.

Brookdale paid him for it and is processing discipline for that.  None of the three employees were

terminated. Ms. Sacro's testimony that Mr. Ahanmisi knew she was working off the clock because

he would see her at times after her shift, if believed, is not sufficient to prove that Mr. Ahanmisi

knew she was working off the clock, particularly given the testimony that she regularly worked

overtime for which she was paid. Ms. Sacro also testified that she told Mr. Ahanmisi and Ms. Mohr

in February 2016 that she was working off the clock, which was not credible.  Mr. Ahanmisi and

Ms. Mohr, who were more credible, denied having been told prior to the May 20, 2016 meeting.

Ms. Sacro knew she could file grievances but she did not do so regarding working off the clock.

She did not contact the Integrity Hotline or Mr. Gonzaga.  The Arbitrator finds that the evidence

does not establish actual knowledge by Brookdale that Claimant worked off the clock.

(16) Whether Ms. Sacro concealed her off the clock work from Brookdale: Ms. Sacro

purposely clocked out and then returned to the community to work. She admitted at deposition that

she intentionally staggered her clock-out times, even when she had approval for overtime, so as not to raise red flags. She purposely clocked out for meal breaks but at least three times a week but intentionally continued working. On a Corrective Action Form and on a Kronos Adjustment Form, Ms. Sacro wrote that she took compliant meal periods when she now states she did not do so. She wrote Kronos Adjustment Forms that said she took meal periods when she testified she did not take them. When Mr. Ahanmisi reminded Ms. Sacro to clock out and take her breaks, she told him she was doing so, when she now says she was not. Ms. Mohr, Mr. Ahanmisi and Mr. Gonzaga testified that they did not know until the May 20, 2016 meeting that Ms. Sacro was alleging off the clock work. The Arbitrator finds that Claimant purposely concealed off the clock work from Brookdale.

(17) Whether Brookdale reasonably should have known of off the clock work by Ms. Sacro: Both Ms. Sacro as well as Princess Ceja testified that Mr. Ahanmisi saw them working after the end of their shifts, but each testified that neither told Mr. Ahanmisi that they were working off the clock. Claimant argues that when Mr. Ahanmisi saw Ms. Sacro working after hours, Brookdale should have known that the nurse was working off the clock. However, given the fact that Brookdale regularly approved Ms. Sacro's overtime, and other nurses' requested overtime, and regularly paid Ms. Sacro the requested overtime, the Arbitrator finds that even if Mr. Ahanmisi did see a nurse on the premises after his or her shift was over, is not, in and of itself, notice that he/she was working off the clock. Brookdale counted on its staff, including its supervisors, like Ms. Sacro, to follow the policies, which included logging in and out of Kronos so that all time is recorded. However, Ms. Sacro testified she clocked out and continued to work and lied on documents in order to conceal her off the clock work. It was reasonable for Brookdale to rely on the Kronos records and any approved Kronos Adjustments. PCC is not a time-keeping system and

FINAL AWARD                                                                                         23

because it is not set up for time-keeping, it does not generate its data in a way that would allow Brookdale to extrapolate the number of hours that an employee was actually working, and working off the clock. Claimant presented evidence through Ms. Sacro and third party witnesses to show there was a culture of too much work and discouraging overtime reporting. However, based upon the evidence from Ms. Jensen, Mr. Ahanmisi and Ms. Mohr, the credible evidence shows no evidence that Brookdale should have known that Ms. Sacro was working off the clock.

(18) Staffing: Brookdale's staffing exceeds the minimum requirements established by the State of California. The evidence presented did not show inadequate staffing. Typical staffing was four nurses per shift; the State required 3.4 staff per shift. Although Ms. Sacro testified extensively about her patient care responsibilities, the testimony of Ms. Jensen and of Mr. Ahanmisi regarding what a nursing supervisor could and could not delegate show credibly that Ms. Sacro could have delegated much of her work to others and to the next shift, rather than showing that more nurses were needed.

(19) Point Click Care (PCC): This is the cloud-based electronic patient records care system. Each employee has his or her own log-in and password. The only purpose of PCC is to document patient care. The assessment of the patient, medications, diet orders, all medication, treatment orders, wound descriptions, plan of care, instructions to CNAs, and any acute symptoms were the typical items in the PCC chart. There are computers in the nurses' station and carts with laptops for use in patient rooms. Brookdale requires that nurses use their own log-in information and identification to log in. If the supervisor of nursing, Mr. Ahanmisi, or any nurse, wants to review a patient's records, he or she can access it on PCC. The system is not set up for Mr. Ahanmisi to pull up hours on computer information on a nurse. Some staff log in to PCC and do other things or are interrupted in their charting and leave the PCC open, often minimizing the screen.

FINAL AWARD                                                                                          24

Sometimes other staff use the system while it is open even if someone else logged in. Thus, a nurse can use PCC, leave it open when clocking out after a shift, and if another nurse uses the open PCC within an hour without re-logging in, the PCC will not accurately reflect the identity of the person using the system and the system can be used for an indefinite period of time, until an hour has passed from the last use. Because PCC is not designed as a time-keeping system, the only information that is available administrator is the identity of the person who signed on, the date and time, and the time that the system closed under that identity. Sonja Brunston-Fergus, the PMK regarding PCC, testified about her ability to generate a report to show the log-in and log-out information of users in a particular facility and that she can easily generate a report regarding an employee's log-in and log-out information. She has done so fifteen to twenty times in the past in response to inquiries within Brookdale. She provided two examples, neither of which appeared to be related to time-keeping. In fact, there was no evidence offered by either party in this case that Brookdale ever generated a PCC log for time-keeping purposes. In response to discovery in this case, Christopher Cook, Senior Director of IT Operations produced PCC Log-In/Log-Out History Reports for Geneflor Sacro for the dates worked. (Exhibit 16, 17)

(20) Evidence of the number of hours worked off the clock by Ms. Sacro: Ms. Sacro did not provide Brookdale with an estimate of her off the clock hours. She refused, both before and after her resignation. Ms. Sacro did not even tell Brookdale how long she had been working off the clock. Brookdale asked her, both before and after her resignation, to take a few days and give them an estimate. Mary Mohr gave Ms. Sacro a printout of her Kronos timesheets and suggested she could look at patient records to jog her memory. Ms. Mohr spoke with Mr. Ahanmisi about giving Ms. Sacro time to go through the programs she has available to her to find out what days she worked off the clock. Mr. Ahanmisi told Ms. Mohr he would give Ms. Sacro time to do that

It was Ms. Mohr's understanding that Ms. Sacro would be paid for her time assembling her off the clock time. However, in Arbitration, Ms. Sacro testified that no one told her whether she would be paid to assemble her hours. Claimant provided PCC data from which she argues 677.69 off the clock hours are recorded, and Ms. Sacro testified that she had about fifteen minutes to one hour of work after she clocked off of PCC before she would leave the community, which Claimant estimates as 30 minutes per shift.    When an employer does not maintain time records, a Court (Arbitrator) is to consider the employee's reasonable estimate of overtime. Here, the employer here did maintain a timekeeping system on which employees were trained. Ms. Sacro circumvented the system and in Arbitration seeks to rely on PCC data that is not a trustworthy estimate the number of hours worked off the clock.

(21) Rest Break Policy: Brookdale maintained a valid written and oral rest break policy consistent with California law that the employee be relieved of all duties during the break. Ms. Sacro was instructed on the policy that she was free to take her rest breaks. Despite Ms. Sacro's testimony that the high demands of patient care made it impossible for her to take two rest breaks in an eight hour shift or three ten minute breaks if she worked for twelve hours, Ms. Sacro never filed a grievance regarding missed rest breaks. She did not complain to her supervisor, to human resources, to the anonymous Integrity Hotline or to the person in charge of the facility, Mr. Gonzaga.   Additionally, the wording of Rest Break Policy in the Employee handbook is not deficient.

(22) Meal Break Policy: Brookdale maintained a valid written and oral meal break policy consistent with California law that the employee must be free to do what he/she wants during the break. Ms. Sacro was instructed on the policy and understood that she was required to clock out for her half-hour meal breaks. The fact that the policy required the employees to clock out for 30

FINAL AWARD                                                                                    26

minutes does not violate California law. She understood that she could take a different meal break before the fifth hour if work interfered with her scheduled break time. She understood she could fill out a Kronos Adjustment Form, if applicable. Ms. Sacro testified that she would regularly log out for her meal break and reenter the community and continue working.  The PCC records in evidence show that PCC with Ms. Sacro's log-in information was open during a number of shifts in which the Kronos system showed that Ms. Sacro had logged out for her meal break. Claimant argues that this is evidence of time for which Ms. Sacro should have been paid. Ms. Sacro never disclosed to anyone at Brookdale that she surreptitiously worked during her meal breaks. Ms. Sacro never filed a grievance regarding missed meal breaks. She never told her supervisor, human resources, Mr. Gonzaga.  She never called the Integrity Hotline.

(23) Legal Objections

- Respondents object to the excerpts of the deposition transcript of Mr. Okhawere Ahanmisi submitted by Claimant on the last day of the Arbitration hearing toward the end of the session. Mr. Ahanmisi, an employee who supervised Ms. Sacro, testified in person on the first day of the Arbitration hearing.  CCP section 2025.620(b) provides that deposition testimony of an employee can be used for any purpose, even if he has already testified. Therefore, the Respondent's objection is OVERRULED.  The request to strike the deposition excerpts is DENIED.

- Respondents object to Claimant's request for judicial notice of the Ellis Declaration and attached exhibit.  This is the Declaration of Karen Ellis in a different case.  The declaration and request for judicial notice were submitted by Claimant on the last day of the Arbitration hearing toward the end of the session. The declaration was filed in 2014 in another case in which one of the Respondents was a defendant.  The exhibit in question,  wage and hour

FINAL AWARD                                                                                    27

training documents attached to the Ellis Declaration as Exhibit D, were not identified during

the hearing in this arbitration as documents seen or utilized by the management at the

Camarillo facility where Claimant worked. Specifically, the sole testimony regarding Exhibit

D at this Arbitration hearing was that these documents were not used for training at the

Camarillo community where Claimant worked. First, the Arbitrator finds that the Ellis

Declaration and exhibits are not the proper subject of judicial notice, so the objection to the

request for judicial notice is SUSTAINED. Second, no foundation for Exhibit D was provided

at the hearing. Therefore the objection to the declaration and exhibits is SUSTAINED.

Claimant's objection to the Declaration of Joanna Leskowicz is OVERRULED. The

Stipulation of the parties at the beginning of the Arbitration that BKD Twenty-One

Management Company is the employer seemingly was a concession to the identity of the

employer, but when Claimant sought to add Brookdale Senior Living Inc. as a new party after

the close of evidence, Respondent had the right to respond. The Motion to add Brookdale

Senior Living, Inc. as a new party is DENIED based on insufficiency of the evidence.

Respondents' request for judicial notice in its sur-reply brief of the order denying Plaintiffs'

Motion for Class Certification in CV 14-2184 PSG is DENIED as untimely because submitted

after the close of evidence.

    C. Discussion

       An employee is to be paid in full for all hours work, including unauthorized overtime, if

the employer knows or should have known that the employee was working overtime. *Forrester v.*

*Roth's I.G.A. Foodliner, Inc. 646 F.2d 413, 414 (9th Cir. 1981)*. Labor Code section 510, requiring

overtime wages, is not a strict liability statute. Claimant must prove that Respondents knew or had

constructive knowledge that Ms. Sacro was working overtime hours off the clock and still failed

to pay the overtime wages. *Morillion v. Royal Packing Co.* 22 Cal.4th 575 (2000). An employee

is not entitled to regular or premium pay for missed meal breaks if she fails to demonstrate that the

employer knew or reasonably should have known she was working through authorized meal breaks.

When an employer fails to keep accurate records of an employee's work hours, the employee's

reasonable estimate of her work controls. See *Furry v. East Bay Pubishing, LLC* (2018) 30

Cal.App.5th 1072; *Hernandez v. Mendoza* (1988) 199 Cal.App. 3d 721. Here, Brookdale did not

have actual or constructive knowledge that Ms. Sacro was working off the clock. Brookdale

routinely paid requested overtime hours, even when they were not approved in advance. Ms. Sacro

actively concealed she was working off the clock. Among other things, she testified she feared

doing so would affect her license and she testified that she did not want to get Mr. Ahanmisi in

trouble. Her reasons were not credible.

An employee is entitled to waiting time penalties if an employer willfully fails to pay the

wages of an employee who is discharged or resigns. Labor Code section 203(a). Here, Brookdale

is not required to pay Ms. Sacro for her off the clock time or penalties because its failure to pay

was not willful. Brookdale did not know and had no constructive knowledge of Ms. Sacro's off

the clock claims until May 20, 2016. Even when Ms. Sacro disclosed to Brookdale in the May 20,

2016 meeting that she was working off the clock, and Brookdale asked Ms. Sacro to tell them her

hours so she could be paid, she refused. Up to and after Ms. Sacro resigned from Brookdale, June

2, 2016, Brookdale asked her how much time she worked off the clock and Ms. Sacro would not

tell them.

Brookdale had no way of knowing what to pay Ms. Sacro for off the clock work, and it is

unreasonable to require Brookdale to look at electronic medical record keeping, PCC to extrapolate

the hours because it is not reliable for time-keeping purposes. Claimant relies on the 11th Circuit

FINAL AWARD                                                                                    29

position (which is different than the 9th Circuit) set forth in *Allen v. Board of Public Education* 495
F.3d 1306 (2007) for the position that if an employer had an opportunity to acquire knowledge of
an employee's work by using reasonable diligence, then the employer can be charged with
constructive knowledge, but even under *Allen*, the facts here are distinguishable because Ms. Sacro
actively concealed her off the clock work from Brookdale, an exception even under *Allen*.
Brookdale had no reason to inquire.

Brookdale acted in good faith both in relying on its policies and its supervisors to follow
policies and check in on employees, as they did, as well as train on its policies and time keeping
system. While Claimant argues that Respondents cannot claim good faith because they created a
culture and timekeeping system that discouraged reporting, that argument is not supported by the
credible evidence. Brookdale did not pressure its employees to work through breaks and to work
off the clock.

Claimant argues that the meal break policy requiring that the breaks be taken away from
the regular work area is an imposition of control over employees' breaks. The Arbitrator finds that
such an analysis is not consistent with *Augustus v. AMB Security Services* (2016) 2 cal.5th 257, *as
modified on denial of reh'g* (March 15, 2017). *Brinker Rest. Corp. v, Superior Court* 53 Cal. 4th
1004, 1049 (2012), requires that the employee be relieved of all duties and that the employer
relinquish control over her activities. Claimant has not shown as a matter of just and reasonable
inference that the employees were substantially restricted so as to be unable to attend to private
pursuits. The time argued by Claimant for which she should be paid is based upon PCC, a system
that is not set up to record actual work time by a particular staff member.

Respondent argues that Claimant is estopped from claiming overtime and penalties for off
the clock work because Ms. Sacro actively concealed from Brookdale that she was working off

FINAL AWARD                                                                                    30

the clock.  Waiver is an intentional relinquishment of a known right. Equitable estoppel requires Respondents to establish a misrepresentation by Claimant upon which Respondents reasonably relied to their detriment. Claimant argues that there is no waiver and estoppel here because Respondents should have known Ms. Sacro was working off the clock by conducting its own investigation into the PCC data to see if she was complying with policy.  Ms. Sacro chose to conceal her off the clock work knowing she would not be paid for it. Claimant has not proved that Brookdale should have known, and since Brookdale did not have to look beyond its record keeping system and supervision to see if Ms. Sacro was violating policy, and also since Brookdale asked Ms. Sacro to tell them her off the clock hours so they could pay her and Ms. Sacro never provided a reasonable estimate of her OTC time, Claimant waived her right to compensation. See e.g. *Abbe v. City of San Diego* 20007 WL 4146696 at 9* (SD Cal. Nov 9, 2004) aff'd sub. Nom. 444 Fed Appx 189 (9th Cir. 2011)

Respondents do not have to pay Claimant for time shown on the PCC data. It was Claimant's burden to prove that the hours logged onto PCC constituted viable work for which compensation is due. Here, Claimant has not proved that the time logged in PCC represented work by Ms. Sacro versus just an open system, and whether it was work done by Ms. Sacro or by someone else.  For example, and this is just one of a number of possibilities: if, hypothetically, Ms. Sacro logged out of Kronos after 7:30 pm, having been approved for some overtime, and minimized but mistakenly did not log out of PCC, a nurse on the next shift had the ability to use the open PCC system without a new log-in if the nurse opened his/her patient file before the automatic log-out. Another example of why PCC is not reliable as a time-keeping system is that a nurse could log in to PCC to chart and then be called away for patient care, a phone call, or because it is breaktime, and leave the PCC open.

FINAL AWARD                                                                                      31

A1        Simple knowledge that an employee was seen working after shift, and that she regularly

2    asked for overtime, is insufficient to prove actual or constructive knowledge of off the clock work

3    and is not enough, considering all of the facts presented in this case, to establish willful or

4    constructive knowledge.  Claimant's evidence of all the work she did, how hard she worked, that

5    she asked for overtime every "blessed" day, and that there were times when Mr. Ahanmisi told her

6    to go home, do not establish constructive knowledge that Ms. Sacro was working off the clock.

7    Additionally, Mr. Ahanmisi trusted her and she lied to him. See e.g. *Cleveland Groceryworks.com,*

8    LLC, 200 F.Supp.3d 924, 943-45 (ND Cal 2016); *Plaisted v. The Dress Barn* 2013 WL 3000913

9    (U.S. DIST. 2013); *Abbe v. City of San Diego,* 444 Fed Appx. 189 (9th Cir. 2011). While those are

10    summary judgment cases and this is a fact based inquiry, the rationale is instructive.

13        What is the significance of Ms. Mohr suggesting to Ms. Sacro that looking at her patient

14    records might help her recall her OTC time?  The significance is only that Brookdale in good faith

15    wanted to pay Ms. Sacro for her unreported hours and Ms. Mohr, who did not know how the PCC

16    system works, thought that if Ms. Sacro looked at a patient's chart, it might help her remember the

17    particular situation in which the hours were accrued.  This does not mean that PCC records are

18    valuable or accurate as time-keeping records.

19

20        Uninterrupted meal breaks: Employers are required to provide meal breaks to employees

21    in compliance with wage orders issued by the IWC.  See California Labor Code section 226.7(a).

22    An employer is obligated to provide a first meal period after no more than five hours of work and

23    a second meal period after no more than ten hours of work. The employer must relieve the

24    employee of all duty for the designated period, but need not ensure that the employee does not

25    work. *Brinker Rest. Corp. v, Superior Court,* supra at 1049.  Ms. Sacro failed to provide sufficient

26    evidence to support her meal break claim.

27

28    FINAL AWARD                                                                                              32

Rest Breaks: Brookdale had an adequate rest break policy, and both Ms. Mohr and Mr. Ahanmisi told the staff to take breaks, but Brookdale did not have an obligation to ensure that Ms. Sacro did no work during her breaks. *Brinker Rest. Corp v. Superior Court,* supra at 1034. The choice was hers. No one forced Ms. Sacro to work through breaks. Ms. Sacro did not provide sufficient evidence to support her rest break claim.

Waiting Time Penalties: Given that Ms. Sacro has failed to establish outstanding wages owed to her, waiting time penalties are not warranted.

Wage Statement Claims: Given the above findings, there is no wage statement penalty applicable.

D. Claimant's Objection To Interim Award

The Arbitrator overrules Claimant's Objection to the Interim Award.

I.   Claimant asserts that Ms. Sacro is entitled to judgment as a matter of law on her claim that Director of Nursing Ahanmisi observed her working off the clock and did nothing to compensate her on that occasion. The evidence showed that Ms. Sacro often worked overtime, even when it was not authorized in advance. The Arbitrator finds that the fact that Mr. Ahanmisi saw Ms. Sacro working late, and beyond her shift, does not mean he knew she was working off the clock. He sent her in the direction of the time clock. He had no reason to believe she was working off the clock. [RT191:14-25; RT 192:1-11.]

II.  Claimant asserts that Ms. Sacro is entitled to judgment as a matter of law on her claim that Respondent failed to pay her meal break premiums on seven specific occasions Director of Nursing Ahanmisi acknowledged that she could not clock out for lunch in the first five hours of her shift.   The evidence did not show that on these occasions Brookdale neither authorized nor permitted Ms. Sacro to take a meal break before the

FINAL AWARD                                                                                                33

A1  fifth hour as the law requires. Only that she did not clock out. The Arbitrator finds that

2  judgment as a matter of law awarding premiums is not warranted.

3  III.  Claimant asserts that Ms. Sacro is entitled to an award in her favor for each of sixty-

4  5  five separate occasions Respondent did not compensate her for working more than five

6  hours without a meal break.  Claimant did not establish that Brookdale had an admitted

7  practice of not authorizing timely meal breaks. There are sixty-five occasions in which

8  the Kronos records show that Ms. Sacro did not clock out by the fifth hour. However,

9  10  neither the Kronos records or the other evidence establish that Ms. Sacro was not

11  provided the opportunity to take her meal period by the fifth hour.  A meal break was

12  scheduled for Ms. Sacro on every shift within the first five hours.  The nature of the

13  work showed that Ms. Sacro was a supervisor, that Mr. Ahanmisi was typically on site

14  during the first five hours, and that Ms. Sacro was not the only nurse on shift. Ms. Sacro

15  16  did not prove that the work during these shifts could not have been delegated so she

17  could clock out by the fifth hour or saved for her return from a timely meal break.

18  E.  Final Award

19  The Arbitrator finds that Claimant failed to meet her burden of proof, and finds for

20  Respondents on all claims.

21  SO ORDERED.

22  23  Dated this 4th day of June, 2020

24  25  Hon. Michelle R. Rosenblatt (Ret.)

26  Arbitrator

27  28  FINAL AWARD                                                                                        34

# PROOF OF SERVICE

**State of California**
**County of Los Angeles**

I certify that I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1900 Avenue of the Stars, Suite 200, Los Angeles, California 90067.

On June 12, 2020, I served the foregoing document described as the **AWARD** on the interested parties in this action as follows:

| | |
|---|---|
| C. Joe Sayas, Jr., Esq. | J. Kevin Lilly, Esq. |
| Karl P. Evangelista, Esq. | Shannon R. Boyce, Esq. |
| LAW OFFICES OF C. JOE SAYAS, JR. | Rachel T. Segal, Esq. |
| 500 North Brand Boulevard Suite 980 | LITTLER MENDELSON |
| Glendale, California 91203 | 2049 Century Park East, 5th Floor |
| cjs@joesayaslaw.com | Los Angeles, California 90067 |
| kpe@joesayaslaw.com | klilly@littler.com |
| kat@joesayaslaw.com | sboyce@littler.com |
| | rsegal@littler.com |

Wilmer J. Harris, Esq.
Sarah L. Dawley, Esq.
SCHONBRUN SEPLOW
HARRIS & HOFFMAN
715 Fremont Avenue, Suite A
South Pasadena, California 91030
WHarris@sshhlaw.com
sdawley@sshhlaw.com

_____    **BY STANDARD U.S. MAIL,** I placed a true copy of the document described above in a sealed envelope and caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

__X____    **BY CERTIFIED U.S. MAIL,** I placed a true copy of the document described above in a sealed envelope and caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

_____    **BY FACSIMILE,** I caused such to be faxed to the attorneys on June 12, 2020.

_____    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address *alex@adrservices.com* to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

__X____    **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 12, 2020 at Los Angeles, California



_____
ALEX KIM

## REQUEST FOR CERTIFIED MAIL

| Case Name: | *SACRO v. BROOKDALE SENIOR* |
|---|---|
| Addressee: | C. Joe Sayas, Jr., Esq.<br>Karl P. Evangelista, Esq.<br>LAW OFFICES OF C. JOE SAYAS, JR.<br>500 North Brand Boulevard Suite 980<br>Glendale, California 91203 |
| AFFIX LABEL HERE: | 7018 2290 0002 2263 9005 |
| Case Manager: | CHRISTIE WOO |
| Date: | June 12, 2020 |

| Case Name: | *SACRO v. BROOKDALE SENIOR* |
|---|---|
| Addressee: | J. Kevin Lilly, Esq.<br>Shannon R. Boyce, Esq.<br>Rachel T. Segal, Esq.<br>LITTLER MENDELSON<br>2049 Century Park East, 5th Floor<br>Los Angeles, California 90067 |
| AFFIX LABEL HERE: | 7018 2290 0002 2263 9012 |
| Case Manager: | CHRISTIE WOO |
| Date: | June 12, 2020 |

| Case Name: | *SACRO v. BROOKDALE SENIOR* |
|---|---|
| Addressee: | Wilmer J. Harris, Esq.<br>Sarah L. Dawley, Esq.<br>SCHONBRUN SEPLOW<br>HARRIS & HOFFMAN<br>715 Fremont Avenue, Suite A<br>South Pasadena, California 91030 |
| AFFIX LABEL HERE: | 7018 2290 0002 2263 8992 |
| Case Manager: | CHRISTIE WOO |
| Date: | June 12, 2020 |